Approved: _____ 18 MAG 1311 ORIGINAL
ANDREW C. ADAMS/ ANDREW THOMAS/ JONATHAN REBOLD
Assistant United States Attorneys

Before:   THE HONORABLE DEBRA FREEMAN
          United States Magistrate Judge
          Southern District of New York

[Stamp: U.S. DISTRICT COURT FILED FEB 15 2018 S.D. OF N.Y. DS]

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :   **SEALED COMPLAINT**
                                  :
         - v. -                   :   Violation of
                                  :   18 U.S.C. § 1349
ALEKSANDR RAZUMOVSKIY, and        :
GEDIMINAS BERTULIS,               :   COUNTY OF OFFENSE:
                                  :   NEW YORK
                   Defendants.    :
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       RANDY FARRENCE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE

       1.   From at least in or about August 2017, up to an including on or about February 13, 2018, in the Southern District of New York and elsewhere, ALEKSANDR RAZUMOVSKIY and GEDIMINAS BERTULIS, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud in violation of Title 18, United States Code, Section 1344, to wit, RAZUMOVSKIY participated in a scheme to cash checks drawn on unfunded bank accounts, opened in the name of sham companies created by SAMOILENKO and others, at multiple check-cashing businesses located across the country.

       2.   It was a part and an object of the conspiracy that ALEKSANDR RAZUMOVSKIY and GEDIMINAS BERTULIS, the defendants, and others known and unknown, would and did execute and attempt to execute a scheme and artifice to defraud financial institutions, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property

owned by, and under the custody and control of, such financial institutions, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

3. The bases for my knowledge and the foregoing charge are, in part, as follows: I am a Special Agent with FBI and have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. Since in or about August 2017, the FBI has been investigating a coordinated fraud directed against check cashing businesses in cities around the country, including New York City (the "Check Scam"). The Check Scam involves numerous individuals presenting what appear to be company payroll checks to multiple check-cashing businesses in the same city at approximately the same time, obtaining proceeds from the victim-businesses before they detect that the account on which the checks were to be drawn has insufficient funds, and then re-locating to another city to commit the fraud again. The Check Scam appears to have caused hundreds of thousands of dollars in losses in the last year alone.

5. Information regarding the Check Scam derives, in part, from the proactive work of a cooperating witness ("CW-1") who has pleaded guilty to federal crimes in an unrelated case and who has worked to assist the Government in hopes of receiving leniency at sentencing. Based on conversations with CW-1, a review of recordings created by CW-1, visual surveillance, and a review of records maintained by various check cashing businesses, I have learned, in part, the following:

a. In or about August 2017, CW-1 responded to an online job advertisement offering pay of $5,000 to $7,000. CW-1 spoke to "Sergey" and arranged a meeting. CW-1 then met "Sergey"

— later identified as a particular co-conspirator ("CC-1") — in Brooklyn, New York. During that meeting, which was not recorded and occurred prior to the involvement of law enforcement, CC-1 informed CW-1, in substance and in part, that CC-1 leads one of three "crews" of individuals who travel together to various states for the purpose of cashing checks. CC-1 explained that the group would obtain identification cards in the destination state, and would travel, eat, and lodge together. CC-1 represented that the work was legal.

        b. On or about August 17, 2017, CW-1, acting at the direction of law enforcement, spoke to CC-1 to agree to join CC-1's check cashing "team." The conversation was audio recorded. During that conversation, in substance and in part, CC-1 told CW-1 that CC-1 would travel from Florida to Brooklyn to pick up CW-1, and would drive CW-1 from Brooklyn to Virginia (*i.e.*, through the Southern District of New York) to obtain a Virginia state identification card. After CW-1 received the identification card, CC-1 said he was to join CC-1's crew cashing checks.

        c. On or about August 27, 2017, CC-1 and another member of CC-1's check cashing team ("CC-2") picked up CW-1 in Brooklyn, New York and drove him to Virginia, crossing through the Southern District of New York as they did so. Prior to the meeting, the FBI provided CW-1 with a recording device, and conversations between CC-1, CC-2, and CW-1 were therefore recorded. During the period of the recording, which continued until the following day, CC-1, in substance and in part, informed CW-1 that the crew worked by presenting one payroll check per week to each of approximately forty different check cashing stores. CC-1 would drive the crew around to the various check cashing locations. The checks were printed so as to appear to be drawn on the account of a company CC-1 had established in Virginia and that was publicly searchable on the internet; if a check cashing employee called the public number of the company as it appeared on the check, another co-conspirator, referred to as a "dispatcher," would answer the phone and purport to verify the company's existence. CC-1 stated, in substance and in part, that the "dispatcher" for CC-1's crew was an individual known as "Alex."

        d. On or about August 28, 2017, CC-1 and CC-2 drove CW-1 to a UPS store in Alexandria, Virginia. Once there, CC-1 texted CW-1's personal information to another co-conspirator ("CC-3"). A few minutes later, the UPS store received an email containing a lease agreement and utility bill in CW-1's name

3

purporting to show that CW-1 resided in Alexandria (at the street address of the UPS store). CW-1, at CC-1's direction, took the documents to a Department of Motor Vehicles office in Lorton, Virginia, where CW-1, at again at CC-1's direction, applied for a Virginia state identification card using the fictitious lease and utility bill.

        e. On or about September 12, 2017, CW-1 met CC-1. During that meeting, CC-1 abandoned his original pretense that this Check Scam was legal and explained the Check Scam more fully to CW-1. CC-1 told CW-1, in substance and in part, that the Check Scam was broken up into multiple roles: check cashers earned 25% of the total amount of cash they were able to withdraw from victim check cashing businesses; dispatchers receive 20% of the total amount of cash made by all check cashers in the crew; the crew boss gets 25% of total; and a boss in charge of multiple crews gets 30% of the total amount of cash made by each crew. CC-1 further explained, in substance and in part, that "Alex," CC-1's dispatcher, coordinated other check cashing crews, including a crew operating in Georgia.

        f. On or about September 13, 2017, CW-1, at CC-1 direction, cashed approximately $10,000 to $11,000 worth of checks across approximately nine check cashing locations in Virginia. At the end of that day, CC-1 took all of the cash obtained by CW-1 and deposited that cash into a bank account using an ATM on the street. Later, CC-1 informed CW-1, in substance and in part, that the group planned to conduct the check cashing operation in Virginia for another two weeks before they made "the profit," meaning that the Check Scam's coordinated and large-scale overdraft would occur after approximately two weeks of smaller and non-suspicious withdrawals on the sham bank account.[1] CC-1 further stated, in substance, that the crew would next focus the Check Scam on check cashing locations in the Chicago area.

        g. On or about September 20, 2017, CC-1, CC-2, and CW-1 met in a hotel room in Virginia to split up the cash that, according to CC-1, represented the profits of the Check Scam as conducted in Virginia over the previous two weeks. During the meeting, CW-1 received $7,000, which represented a rounded share of the total checks that CW-1 cashed, less expenses incurred by

---

[1] The sham bank account used by SAMOILENKO in connection with this activity in Virginia was opened at a particular nationwide bank ("Bank-1"), which, from my review of publicly available information provided by the Federal Deposit Insurance Corporation ("FDIC"), I know to be FDIC insured.

4

CC-1. CC-1, in substance and in part, informed CW-1 that (i) the check cashing businesses suffered losses on the basis of the Check Scam and (ii) CC-1 had paid a stranger to incorporate the company used on the payroll checks to avoid associating that company with the crew.[2]

  h. CC-1's crew then moved their operations to Chicago. Between on or about September 25, 2017 and September 28, 2017, CW-1, at CC-1's direction, participated in the Check Scam by, among other things, (i) obtaining an Illinois state identification document using a fake lease agreement and fake utility bill provided by CC-1, (ii) traveling with CC-1 to dozens of check cashing businesses, first, on the south side of Chicago, Illinois and, later, on the north side, to engage check cashing store representatives in conversation about each business's practices regard cashing payroll checks, and (iii) discussing the operational plan with CC-1, which included using CC-2, among others, to cash checks at various victim businesses with CW-1.[3]

  i. The Check Scam continued in the Chicago area between late September 2017 and at least on or about December 12, 2017. For example:

  1. Between on or about November 13 and 17, 2017, CW-1, CC-1, and GEDIMINAS BERTULIS, the defendant, traveled together to various check cashing locations in the Chicago area, at which BERTULIS successfully cashed checks drawn on a sham bank account at approximately twenty-one victim check cashing businesses. According to CC-1, the sham account on which these checks were drawn was opened by BERTULIS and ALEKSANDR RAZUMOVSKIY, the defendant, in Florida.

  2. On or about November 20, 2017, FBI agents surveilled BERTULIS traveling to two separate particular check

---

[2] Based on records provided by the various banks defrauded in the course of SAMOILENKO's offense, and based on my conversations with other law enforcement agents involved in this investigation, I have learned, among other things, that the banks on which the Check Scam's checks are drawn also incur a portion of the loss associated with the Check Scam.

[3] The sham bank account used by SAMOILENKO in connection with this activity in Chicago was opened at a particular nationwide ("Bank-2"), which, from my review of publicly available information provided by the FDIC, I know to be FDIC insured. Bank-2 is headquartered in the Southern District of New York.

5

cashing locations in Chicago in a vehicle driven by CC-1, at which BERTULIS entered each location and returned shortly thereafter to the vehicle driven by CC-1.

3. On or about December 10, 2017, RAZUMOVSKIY arrived in Chicago to begin overseeing the operations and money collection of the Check Scam.

4. On or about December 12, 2017, RAZUMOVSKIY and CC-1 together divided proceeds of the Check Scam among the various crew members, including BERTULIS and CW-1, who received approximately $17,000 for his participation in the Check Scam's Chicago operation.

6. From my review of documents provided by a particular bank ("Bank-3"), also insured by the FDIC, I have learned, among other things, that the participation of ALEKSANDR RAZUMOVSKIY, the defendant, in the Check Scam predated CW-1's proactive assistance in this investigation by at least approximately one year. For example, on or about December 21, 2016, a co-conspirator not named herein ("CC-4"), using CC-4's name, opened a sham business account using a particular email account ("Account-1") as the contact email address for that sham business. Subsequently, on multiple dates in or about January 2017, various individuals, including an individual using CC-1's name, withdrew multiple checks drawn on this same sham account, ultimately resulting in approximately $100,000 in overdrafts.

7. From my review of emails obtained from Google, Inc., pursuant to a judicially authorized search warrant targeting an account used by CC-1 in the course of the Check Scam ("Account-2"), I have learned, among other things, that:

a. Account-1 was in contact with Account-2 on multiple occasions and is associated with the user name "Alex Razumovskiy."

b. On or about August 26, 2017, Account-1 sent an email to Account-2 with the subject line "Virginia" and a single attachment with the file name "Virginia Check Cashers.pdf." The attached file, when opened, is a document apparently published by the State Corporation Commission of Virginia, Bureau of Financial Institutions, entitled "Check Casher Registrants Operating in Virginia at the Close of Business February 27, 2017." Consistent with its title, the document appears to be approximately fifty pages listing the name and address of various check cashing businesses throughout Virginia.

c. On or about August 29, 2017, Account-1 sent an email to Account-2 with the subject line "Fwd: Virginia 2017" and an attachment with the file name "Virginia CC 2017." The attached file, when opened, is a document apparently published by the State Corporation Commission of Virginia, Bureau of Financial Institutions, entitled "Check Casher Registrants Operating in Virginia at the Close of Business August 21, 2017," *i.e.*, an updated version of the attachment included on the August 26, 2017 email described above.

d. On or about September 25, 2017, the Account-1 sent an email to Account-2 with the subject line "Chicago" and an attachment with the file name "Currency Exchange List." The attached file, when opened, is a Microsoft Word document with approximately eight typed pages containing unlabeled addresses in the Chicago area. From my review of mapping information and "street view" photographs publicly accessible through Google, I have determined that the listed addresses correspond to check cashing businesses in the Chicago area.

WHEREFORE, deponent requests that warrants be issued for the arrest of ALEKSANDR RAZUMOVSKIY and GEDIMINAS BERTULIS, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

RANDY FARRENCE
Special Agent, FBI

Sworn to before me this
15th day of February, 2018

HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

7